SANDWELL INTERNATIONAL INCORPORATED,
*Appellant,*

*v.*

AMERICAN CAN COMPANY,
*Respondent.*

(No. 77-06-07926, CA 15521)

614 P2d 620

Cleveland C. Cory, Portland, argued the cause for appellant. With him on the briefs was Clarence R. Wicks, Portland.

David Novick, Eugene, argued the cause for respondent. On the brief were John E. Jaqua and Jaqua & Wheatley, P. C., Eugene.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is an action for indemnity. In 1967, defendant engaged the plaintiff corporation, an engineering firm, to provide services relating to the design and construction of a pulp and paper manufacturing plant which defendant contemplated constructing. The plant was built and, in 1971, an employe of defendant, Emil McClaughry, was injured while working there. McClaughry sued plaintiff for negligence in the design of the plant. A jury verdict was returned in his favor for $262,331.78. Plaintiff now seeks to recover that amount, plus its costs and attorney fees, on the theory that defendant had an independent duty of care running to it. The trial court found for the defendant. We affirm.

The sole issue on appeal is whether defendant owed an independent duty to plaintiff. The facts are not in dispute. We borrow from the trial court's opinion:

"As part of its undertaking [in providing engineering services] the plaintiff designed that portion of defendant's contemplated mill which would receive, store and handle wood chips and sawdust for use in the manufacture of paper pulp. This design contemplated that chips and sawdust would be trucked to a receiving point. Sawdust would be carried by conveyors to enclosed storage silos. Chips would be carried to a distributing conveyor which would deposit the chips in two outdoor rectangular shaped piles. The two rectangular shaped chip storage piles would be divided by a surfaced roadway. To bring chips into the mill for use in the pulp manufacturing process, a tire wheeled, self-propelled front end loader would carry chips from one of the two storage piles over the surfaced area dividing the two piles to a 'plate feeder.' The chips would then be dumped on the plate feeder which would feed them into a conveyor belt which would transport them into the mill.

"According to the plaintiff, and its position is supported by a preponderance of the evidence, it

[431]

settled upon the aforementioned chip and handling design for two reasons: (1) a tired front end loader operating on pavement could move chips from the storage to the plate feeder more rapidly than a tracked or crawler type vehicle could do so; and (2) a front end loader operating at ground level could not bury the plate feeder with more than 15 feet of chips and thereby avoid problems with 'bridging.'

" 'Bridging' is a phenomenon that occurs when a pile of wood chips or sawdust in excess of 25 feet in height is undermined by a device such as a plate feeder. From above it would appear that the pile is intact to the ground when in fact the pile is merely a hollowed out shell or bridge of wood chips.

"The person primarily responsible for the material storage handling design was a Mr. Robert Towne, one of plaintiff's employees. A Mr. Neal was employed by the defendant as an engineer. His concern was, inter alia, chip storage and handling, and on behalf of the defendant worked with Mr. Robert Towne in the design of that facility. Neal was aware of the reasons for the chip storage and handling design formulated by Towne, and to that extent the defendant also was aware of the reasons for plaintiff's concept.

"After the mill was completed chips and sawdust were initially received, stored and handled as contemplated by the plaintiff. Within a few months, however, some significant changes occurred in the operation. First of all, defendant commenced storing sawdust in the outdoor storage area. Chips were stored in one large pile (not divided by a roadway), and chips and sawdust were moved to the plate feeder by means of a tracked vehicle or crawler.

"As a result of these changes in the chip storage and handling process, the plate feeder frequently was covered by chips and/or sawdust in quantities deeper than 25 feet.

"In 1971 an employee of the defendant named McClaughry was operating a crawler on the chip pile in the vicinity of the plate feeder. The pile was approxmately 40 feet above ground level. Unknown to McClaughry bridging had occurred over the feeder.

[432]

He operated a crawler on the bridge, the bridge broke and he and the vehicle fell some distance onto the plate feeder. McClaughry received significant injuries.

"In 1973 McClaughry filed suit against the plaintiff alleging that it was negligent in the design of the chip storage and handling facility, in that the location of the plate feeder was not marked so that a crawler operator traversing the pile would know the location of the plate feeder. The matter came on for trial in Albany, Oregon, resulting in a judgment in favor of McClaughry against Sandwell in the amount of $262,331.78, and costs in the amount of $185.56. The plaintiff in this case appealed the McClaughry judgment to the Surpreme Court of Oregon. Judgment was affirmed in November of 1975. *McClaughry v. Sandwell Internat'l,* 273 Or 481, 541 P2d 1050 (1975). * * *

"The court further finds that McClaughry's accident would not have occurred had the defendant operated its chip handling and storage facility in the manner it was designed by the plaintiff. * * *"

In *U. S. Fidelity v. Kaiser Gypsum,* 273 Or 162, 166, 539 P2d 1065 (1975), the Supreme Court held that, notwithstanding the provisions of the Workmen's Compensation Act, an employer may be required to indemnify a third party held liable for an employe's injuries if the employer has breached an independent duty owed to the third party. The duty may be express or implied.

In *Boldman v. Mt. Hood Chemical Corporation,* 288 Or 121, 602 P2d 1072 (1979), the court refined its opinion in *Gypsum.* The court identified the following situations as giving rise to a special duty on the employer's part: (1) The *Gypsum* situation, where the employer directed the third party not to install a safety guard on a machine installed by that party. This direction, the court said, created a duty on the employer's part "to use due care toward anyone who might be injured by the unprotected machine and this duty was owed to the installer." *Id.,* at 124.

[433]

(2) The case where an implied duty arises because the employer had contracted to perform services for the party seeking indemnity. *Ibid.* (3) An independent duty will be imposed on the employer where the employer becomes a bailee or lessee of the third party's property. *Id.,* at 125.

We turn now to a consideration of plaintiff's theories for the application of *Boldman* to this case. Plaintiff does not contend that an express duty of care exists. Rather, plaintiff argues that a duty may be implied from the fact that defendant approved the design of the chip pile and was aware of the purpose of the particular design. This duty, plaintiff claims, was breached when defendant altered the design, thereby creating a danger to its employes without notifying plaintiff.

■■ Plaintiff fails to demonstrate the existence of an independent duty of care. Such an independent duty does not arise simply from the fact that defendant purchased services from plaintiff. There must be some evidence of a *particular duty. Boldman v. Mt. Hood Chemical Corporation, supra,* 288 Or at 128. It is true that defendant was aware of the purpose of the design and was negligent in altering it. However, American's duty to maintain a safe work environment runs solely to its employes. This duty is discharged by payment of worker's compensation benefits.

The court in *Boldman,* quoting from a federal district court decision, stated

"* * * The implied obligation to indemnify must rest on a particular duty the employer who has purchased the machine owes to the manufacturer, distinct from the duty he owes to his employees. * * * Clearly, the mere fact of a contractual relationship between the would-be indemnitee and indemnitor does not necessarily give rise to an implied obligation to indemnify. * * *

"Star Chopper's indemnity claims based on Third Party Defendant's alleged failure to warn its employees of the hazards of the machine and any alteration or misuse following delivery are easily dismissed. * * * The employer's duty of proper use and care of the machine runs solely to its employees. Liability for breach of that duty has been satisfied by payment of a compensation award. The employer does not have an independent duty running to the manufacturer to use the machinery so as to avoid imposition of liability upon the manufacturer. * * *" *Boldman v. Mt. Hood Chemical Corporation, supra,* quoting from *Roy v. Star Chopper Co., Inc.,* 442 F Supp 1010, 1018-1019 (D RI 1977), *aff'd* 548 F2d 1124 (1st Cir 1978) *cert den* 440 US 916 (1979).

■ Plaintiff also relies on the limitation of liability provisions in the purchase of services contract between the parties. That contract states:

"5. *INSTRUCTIONS AND APPROVALS*

"* * * The actions of [plaintiff] shall be subject to the instructions and approvals of [defendant] signified through the [defendant's] authorized official. * * *

"* * * * *

"9. *LIABILITY*

"Plaintiff agrees with the [defendant] that it will provide under this Agreement the standards of care, skill and diligence normally provided in the performance of services in respect of work similar to that contemplated by this Agreement. * * * [i]n any event [plaintiff's] liability under this Agreement shall be limited to loss or damage attributable to acts of [plaintiff,] its officers, servants or agents in contravention of the instructions or approvals referred to in paragraph 5 or to its failure to provide the standards of care, skill and diligence mentioned above."

Plaintiff maintains that it at all times complied with defendant's instructions and acted in accordance with the normal standard of care in providing engineering services to the defendant.

Whatever else this provision limiting *plaintiff's* liability *to defendant* may mean, it is not a contract of indemnity running from defendant to plaintiff.

The judgment of the trial court is affirmed.[1]

---

[1] In view of the disposition we made of this case, we are not required to assess defendant's other theories justifying affirmance.